SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| ARIZONA WATER COMPANY, an Arizona corporation, | ) ) ) | Arizona Supreme Court No. CV-03-0321-PR |

ARIZONA WATER COMPANY, an        )  Arizona Supreme Court
Arizona corporation,             )  No. CV-03-0321-PR
                                 )
           Plaintiff-Appellee    )  Court of Appeals
              Cross-Appellant,   )  Division One
                                 )  No. 1 CA-CV 02-0276
              v.                 )
                                 )
ARIZONA DEPARTMENT OF WATER      )  Maricopa County
RESOURCES, H.R. GUENTHER, in his )  Superior Court
capacity as Director of the      )  Nos. CV 90-001840
Arizona Department of Water      )      CV 99-008015
Resources,                       )
                                 )
        Defendants-Appellants    )
            Cross-Appellees,     )  **O P I N I O N**
                                 )
ARIZONA CORPORATION COMMISSION,  )
                                 )
            Intervenor-Appellee. )
                                 )
_____)

Appeal from the Superior Court in Maricopa County
The Honorable Roger W. Kaufman, Judge

**VACATED AND REMANDED**

_____

Opinion of the Court of Appeals, Division One
205 Ariz. 532, 73 P.3d 1267

**AFFIRMED IN PART, VACATED IN PART**

_____

ARIZONA DEPARTMENT OF WATER RESOURCES                    Phoenix
     By:  W. Patrick Schiffer
          Kenneth C. Slowinski
          Nicole D. Swindle
Attorneys for Defendants-Appellants/Cross-Appellees
Arizona Department of Water Resources

FENNEMORE CRAIG                                          Phoenix
     By:  Timothy Berg
          Norman D. James
          Thomas R. Wilmoth
Attorneys for Plaintiff-Appellee/Cross-Appellant
Arizona Water Company

SALMON LEWIS & WELDON PLC                                Phoenix
     By:  M. Byron Lewis
          Lisa M. McKnight
Attorneys for Amici Curiae
Salt River Valley Water Users' Association and
Salt River Project Agricultural Improvement and Power District

---

**H U R W I T Z,** Justice

¶1      The issue in this case is whether the 1990-2000 management plan adopted by the Arizona Department of Water Resources ("ADWR" or the "Department") for the Phoenix active management area violated the Arizona Groundwater Code (the "Code"). We conclude that ADWR was statutorily authorized to promulgate those portions of the management plan in which per capita conservation requirements were directly imposed on water providers, but was not mandated by the Code to impose conservation requirements directly on all "end users." We also conclude ADWR may consider a provider's use of Central Arizona Project ("CAP") water in calculating that provider's total annual per capita water use.

2

¶2     The Groundwater Code, Ariz. Rev. Stat. ("A.R.S.") §§ 45-401 to -704 (2003 & Supp. 2003), was originally enacted as part of the Groundwater Management Act of 1980, 1980 Ariz. Sess. Laws, 4th Spec. Sess., ch. 1.  In adopting the Code, the legislature found "that the people of Arizona are dependent in whole or in part upon groundwater basins for their water supply and that in many basins and sub-basins withdrawal of groundwater is greatly in excess of the safe annual yield."  A.R.S. § 45-401(A).  The legislature further found that these withdrawals were "threatening to destroy the economy of certain areas of this state and [were] threatening to do substantial injury to the general economy and welfare of this state and its citizens."  *Id.*

¶3     The Code was designed to protect the state's economy and welfare, and to "provide a framework for the comprehensive management and regulation of the withdrawal, transportation, use, conservation and conveyance of rights to use the groundwater in this state."  A.R.S. § 45-401(B).  Responsibility for these critical matters was placed in the hands of ADWR, A.R.S. § 45-102(A) (2003), headed by a Director, A.R.S. § 45-102(B), with sweeping "general control and supervision" of groundwater, A.R.S. § 45-103(B) (2003).

¶4     The Groundwater Code established four initial "active management areas" ("AMAs").  A.R.S. § 45-411(A).[1]  ADWR was required to adopt five successive conservation management plans for each AMA, one for each decade beginning in 1980.[2]  A.R.S. § 45-563(A).  For the Tucson, Phoenix, and Prescott AMAs, the Code's "management goal" was to establish "safe-yield," a balance between the amount of groundwater withdrawn and the amount naturally and artificially recharged, A.R.S. § 45-561(12), by no later than 2025.  A.R.S. § 45-562(A).[3]

¶5     The Groundwater Code required, as part of the first management plan for the Tucson, Phoenix, and Prescott AMAs, that the Director establish "[a] conservation program for all non-

_____

[1]     The four original AMAs were the Tucson, Phoenix, Prescott, and Pinal AMAs.  A.R.S. § 45-411(A).  In 1994, the legislature created the Santa Cruz AMA from a portion of the Tucson AMA.  A.R.S. § 45-411.03(A).

[2]     The first four management plans apply, respectively, to the four decades between 1980 and 2020.  A.R.S. §§ 45-564 (first plan), -565 (second plan), -566 (third plan), -567 (fourth plan).  The fifth management plan will apply between 2020 and 2025.  A.R.S. § 45-568.

[3]     For the Pinal AMA, the "management goal" was "to allow development of non-irrigation uses as provided in this chapter and to preserve existing agricultural economies . . . for as long as feasible, consistent with the necessity to preserve future water supplies for non-irrigation uses."  A.R.S. § 45-562(B).  For the Santa Cruz AMA, the "management goal" was to "maintain a safe-yield condition . . . and to prevent local water tables from experiencing long-term declines."  A.R.S. § 45-562(C).

irrigation uses of groundwater."[4]  A.R.S. § 45-564(A)(2).  For municipal uses,[5] the initial plans were to require "reasonable reductions in per capita use and such other conservation measures as may be appropriate for individual users."  *Id*.  For the second management period, the Director was required to "[e]stablish additional conservation requirements for all non-irrigation uses of groundwater."  A.R.S. § 45-565(A)(2).  With respect to municipal uses, the second plan "shall require additional reasonable reductions in per capita use to those required in the first management period and use of such other conservation measures as may be appropriate for individual users."  *Id*.

¶6      The Department's primary method of implementing the Code's conservation requirements has been the "Total Gallons Per

---

[4]      "Non-irrigation use" is defined by the Code, for all but the Santa Cruz AMA, as "a use of groundwater other than an irrigation use."  A.R.S. § 45-402(28)(a).  "Irrigation use" is defined generally as the use of groundwater to produce plants for various agricultural purposes.  A.R.S. § 45-402(23)(a).

[5]      "Municipal use" is defined as

all non-irrigation uses of water supplied by a city, town, private water company or irrigation district, except for uses of water, other than Colorado river water, released for beneficial use from storage, diversion or distribution facilities to avoid spilling that would otherwise occur due to uncontrolled surface water inflows that exceed facility capacity.

A.R.S. § 45-561(11).

5

Capita Per Day" ("GPCD") programs in the management plans. These programs limit the total quantity of water a provider may deliver to its customers each year.[6] This approach places the principal burden of achieving reductions in groundwater use on water providers, who are charged in ADWR's management plans with reducing their total GPCD during each management period. While the second management plan ("SMP") for the Phoenix AMA directly regulates groundwater usage by some high-volume end users, the Phoenix SMP does not impose per capita conservation requirements directly on *all* end users.[7]

**B.**

¶7        Arizona Water Company ("AWC") is a private water company operating in the Phoenix AMA. *See* A.R.S. § 45-402(30)(a) (defining "[p]rivate water company"). Because AWC supplies groundwater for non-irrigation use, it is also classified under the Groundwater Code as a municipal provider. *See* A.R.S. § 45-561(10) (defining "[m]unicipal provider"). In 1988, AWC filed administrative petitions with ADWR seeking

---

[6]        The total annual quantity of water a provider can deliver to its customers is obtained by multiplying the provider's GPCD (set by ADWR in the management plan) by the company's service area population by the number of days in the year.

[7]        The end users subject to direct regulation in the Phoenix SMP include turf-related facilities (parks, golf courses and common areas of housing developments), publicly owned rights-of-way, and new large cooling users.

review and rehearing of the Director's order adopting the Phoenix SMP. The Director denied relief. In 1990, AWC filed suit in superior court seeking judicial review of the Director's decision.

¶8     AWC's complaint alleged that the SMP violated the Groundwater Code because it did not impose conservation regulations directly on AWC's end users. The complaint also challenged various other provisions in the SMP applicable to AWC's water utility companies. Shortly after the complaint was filed, AWC applied to ADWR for administrative review of the GPCD requirements imposed upon several of its water utilities, including its Apache Junction system. The superior court action was stayed pending the Director's review of AWC's administrative applications. AWC and ADWR eventually resolved all disputes except those pertaining to the Apache Junction system. The Apache Junction system remained out of compliance with the GPCD requirements of the SMP because of rapidly increasing nonresidential uses of water, primarily by golf courses, without proportionate increases in the population served by the utility.[8]

---

[8]     When the SMP was promulgated in 1989, the Apache Junction system pumped 2400 acre feet of groundwater, and served a population of 20,557. In 1997, the population of the system had increased by about fifty percent, but the use of groundwater had increased sixty-three percent to 3920 acre feet.

¶9     After the parties' failure to resolve the dispute over the Apache Junction system, an administrative law judge conducted a hearing and recommended a recalculation of the Apache Junction GPCD based on updated population estimates. Even after the recalculation, however, the Apache Junction system was still not in compliance with the SMP, and the judge recommended denial of AWC's other requests for relief. In 1999, the Director adopted the recommended decision of the administrative law judge, with minor modifications. AWC then filed suit in superior court seeking review of the 1999 decision, and the court consolidated this suit with the pending 1990 action.

¶10    AWC's superior court complaints alleged that the GPCD mandates in the SMP conflicted with requirements imposed by the Arizona Corporation Commission under AWC's certificates of necessity and convenience to serve customers in the Apache Junction area. The superior court therefore requested the Commission to intervene. The Commission did so and argued that ADWR had no authority to tell a water utility subject to Commission regulation which customers it could or could not serve. Despite its legal position, the Commission saw no present irreconcilable conflict between it and ADWR with respect to AWC's situation, and suggested that because it had worked collaboratively with "sister state agencies" in the past when

8

issues of overlapping regulation were presented, it was confident that it would be able to work with ADWR should a conflict arise in the future.

¶11 In 2002, the superior court entered a judgment holding that the SMP was unenforceable "because it fails to address water utilization by end users."[9] The court remanded the case to ADWR with directions to adopt an amended plan, and forbade the Department from enforcing the GPCD requirement for the AWC Apache Junction system "[u]ntil such deficiencies are corrected."

## c.

¶12 ADWR appealed, and in a 2-1 opinion, the court of appeals affirmed the superior court judgment insofar as it held the SMP invalid for failure to impose conservation requirements on end users. *Ariz. Water Co. v. Ariz. Dep't of Water Res.,* 205 Ariz. 532, 73 P.3d 1267 (App. 2003). The majority acknowledged that "there is no specific statutory provision by which the legislature definitively ordered the Department to create and impose conservation measures for end users." *Id.* at 537 ¶ 18,

---

[9] At the time of the trial court's decision in 2002, the SMP, which covered the decade from 1990 to 2000, had long since expired. The issues raised in this case are not moot, however, because ADWR's third management plan is virtually identical in all relevant respects to the SMP and AWC currently has an action pending in superior court challenging that plan. *See Ariz. Water Co. v. Ariz. Dep't of Water Res.*, 205 Ariz. 532, 535 ¶ 8 n.1, 73 P.3d 1267, 1270 n.1 (App. 2003).

73 P.3d at 1272.  Nonetheless, citing various provisions of the Groundwater Code, the majority below "develop[ed] a firm conviction that the legislature intended just that."  *Id.*  The majority concluded that

> common sense dictates that if one is assigned the duty of conserving a limited resource like groundwater, one needs the authority, and one must assume the corresponding responsibility, to manage the resource throughout its entire cycle, from extraction to transportation to consumption and even recharge.  And if the manager is to obtain the desired conservation result, all those participating in the cycle must be managed directly in regard to their conservation responsibility, including the customer who uses the groundwater and not just the provider who extracts, transports, and delivers it to him.

*Id.*

¶13     Judge Irvine dissented from this conclusion.  He relied primarily on A.R.S. § 45-565(A)(2), which requires the SMP to include for municipal uses "additional reasonable reductions in per capita use to those required in the first management period and use of such other conservation measures as may be appropriate for individual users."  205 Ariz. at 547 ¶ 78, 73 P.3d at 1282 (Irvine, J., concurring in part and dissenting in part).  Judge Irvine read this language as *authorizing* the Department to impose conservation requirements directly on end users, but not *mandating* such direct regulation.  *Id.* at 547-48 ¶¶ 76-80, 73 P.3d at 1282-83.  He also parted company with the majority on its "common sense" view of the

10

Code, arguing that it was not obvious that direct regulation of all end users was sensible policy, and that in any event the legislature had left such decisions to the Director's discretion. *Id.* at 548 ¶¶ 81-82, 73 P.3d at 1283.

¶14     Although it concluded that management plans *must* regulate end users, the majority below declined to decide whether the Groundwater Code gave ADWR authority to impose conservation requirements directly on providers even in the presence of comprehensive regulation of end users, finding that AWC had not raised the issue. *Id.* at 538 ¶ 27, 73 P.3d at 1273. Judge Irvine, however, concluded that AWC had raised this issue, and explained in detail his view that the legislature had authorized ADWR to impose conservation requirements directly on providers. *Id.* at 544-46 ¶¶ 60-73, 73 P.3d at 1279-81 (concurring and dissenting opinion). The majority noted in dictum that "if we believed Arizona Water had properly raised the issue, we would respond to Arizona Water's contention precisely as has our dissenting colleague." *Id.* at 538 ¶ 27, 73 P.3d at 1273.

¶15     Finally, the court of appeals turned to an issue "presented to the superior court but not decided by it": whether ADWR "is authorized to include Central Arizona Project water used by a provider in determining that provider's compliance with its total GPCD requirements." *Id.* at 536 ¶ 13, 73 P.3d at

11

1271.  The court unanimously concluded that the Groundwater Code authorized ADWR to consider use of CAP water in determining a provider's compliance with the GPCD.  *Id*. at 541-43 ¶¶ 47-52, 73 P.3d at 1276-78; *id*. at 543 ¶ 58, 73 P.3d at 1278 (concurring and dissenting opinion).

¶16     ADWR petitioned this court for review of the opinion below insofar as it vacated the SMP for failure sufficiently to regulate end users.  AWC cross-petitioned for review on the CAP water issue.  We granted review of both petitions because of the statewide importance of the issues presented.  We have jurisdiction pursuant to Article 6, Section 5(3) of the Arizona Constitution, Arizona Rule of Civil Appellate Procedure 23, and A.R.S. § 12-120.24 (2003).  Because the case involves issues of statutory interpretation, our review is de novo.  *Bilke v. State*, 206 Ariz. 462, 464 ¶ 10, 80 P.3d 269, 271 (2003).

## II.

¶17     This case presents three related issues of statutory interpretation.  First, we must determine whether the Groundwater Code authorizes ADWR to impose GPCD requirements directly on municipal providers such as AWC.  If we conclude that ADWR has that statutory authority, we must next decide whether the Code requires that the Director, as a prerequisite for imposing such GPCD requirements, must also impose conservation requirements directly on all end users.  Finally,

12

if we conclude that ADWR can impose GPCD requirements directly on AWC, we must also decide whether the Code permits ADWR to consider CAP water use in determining whether AWC has exceeded the mandated GPCD.

**A.**

¶18     AWC first argues that the Code provides no authority for ADWR to impose GPCD requirements directly on municipal providers.[10]  The argument is grounded on A.R.S. § 45-565(A)(2), which provides that the SMP "shall require additional reasonable reductions in per capita use to those required in the first management period and use of such other conservation measures as may be appropriate for individual users."  *See also* A.R.S. § 45-564(A)(2) (containing parallel language applicable to the first management plan).  AWC contends that because the statute refers to per capita "use," it confers upon ADWR no authority to impose GPCD requirements on providers, as opposed to end users, of groundwater.  Rather, AWC contends, municipal providers may only be regulated under A.R.S. § 45-565(A)(5), which requires the

---

[10]     We agree with Judge Irvine that AWC properly raised this issue in the court of appeals.  *Ariz. Water Co.*, 205 Ariz. at 544 ¶¶ 60-61, 73 P.3d at 1279 (concurring and dissenting opinion).   In any event, because this court can affirm the superior court's judgment on any basis supported by the record, AWC may raise this argument here.  *See Cross v. Cross*, 94 Ariz. 28, 31, 381 P.2d 573, 575 (1963) (noting that this court "will consider any legal theory within the issues and supported by the evidence which tends to support and sustain the judgment of the trial court").

Director to impose "additional economically reasonable conservation requirements" on private water companies, but does not refer expressly to per capita use reductions.

¶19       The premise of AWC's argument is that a municipal provider does not "use" groundwater.  However, the language of the Code is directly to the contrary.  Section 45-565.01(A) requires management plans to make available to municipal providers an alternative "non-per capita conservation program" ("NPCCP").  Before the Director can grant the provider's application to participate in certain NPCCPs, he must make "a preliminary determination that *the municipal provider's projected groundwater use* is consistent with achieving the management goal of the active management area."  A.R.S. § 45-565.01(E)(3) (governing applications for programs established under § 45-565.01(C)(5)) (emphasis added); *see also* A.R.S. § 45-565.01(E)(4) (containing similar language with respect to applications for programs established under § 45-565.01(C)(6)). The legislature thus plainly contemplated that a municipal provider's transfer of groundwater to end users can itself be a "use" of that groundwater.

¶20       More significantly, the statute governing NPCCPs makes plain that the legislature intended that ADWR have the authority under A.R.S. § 45-565(A)(2) to impose GPCD requirements directly on municipal providers.  Section 45-565.01(H) states that a

14

municipal provider who has filed an NPCCP application "shall comply with the per capita conservation requirements established under § 45-565, subsection A, paragraph 2 until the director approves the application." The same statute provides that after the application is approved, "the provider is exempt from the per capita conservation requirements prescribed under § 45-565, subsection A, paragraph 2." This language conclusively demonstrates that the legislature contemplated that GPCD requirements could be imposed directly on municipal providers. It would make no sense otherwise to offer NPCCP programs, which are designed as alternatives to otherwise applicable GPCD requirements, to municipal providers. Indeed, because NPCCP programs are *only* available to municipal providers, and not to individual end users, § 45-565.01(H) would be entirely superfluous if municipal providers were not subject to GPCD requirements in the first place.

**B.**

¶21 AWC next argues that before ADWR can impose GPCD requirements on a municipal provider, it must also impose conservation requirements directly on the provider's end users. This is the issue that divided the court below.

¶22 We start from the premise, candidly acknowledged both by AWC and the majority below, "that there is no specific statutory provision by which the legislature definitively

15

ordered the Department to create and impose conservation measures for end users." *Ariz. Water Co.*, 205 Ariz. at 537 ¶ 18, 73 P.3d at 1272. Nonetheless, the court of appeals, based on its review of certain provisions of the Code, "develop[ed] a firm conviction that the legislature intended just that." *Id.* Our reading of the Code leads us to the opposite conclusion. We hold that while the Code authorizes ADWR to impose conservation requirements directly on end users, it does not require that the Director always do so, or that he must impose requirements directly on all end users.

¶23    The first provision of the Code cited by the majority below, A.R.S. § 45-492(A)(2), simply provides that "a city, town or private water company shall have the right to withdraw and transport groundwater," and the "landowners and residents" may use groundwater delivered to them, "subject to . . . [c]onservation requirements developed by the director pursuant to article 9 of this chapter [A.R.S. §§ 45-561 to -578]." This statute does not mandate that these conservation requirements be imposed directly on end users; instead, it merely requires that groundwater use in an AMA be subject to whatever conservation requirements the Director promulgates under article 9.

¶24    AWC also relies on A.R.S. § 45-563(A). Section 45-563(A) generally requires the Director to promulgate management plans for each AMA for the five management periods, and provides

16

that "[t]he plans shall include a continuing mandatory conservation program for all persons withdrawing, distributing or receiving groundwater designed to achieve reductions in withdrawals of groundwater." Notably, this statute does not require the Director to promulgate *separate programs* for each of these groups. Instead, it mandates that each plan include such a program. The fact that the onus for complying with the GPCD program falls primarily on providers surely does not render it anything other than a "mandatory conservation program" under § 45-563(A). And, because the GPCD definitively limits the amount of groundwater that end users in an AMA may receive, it is also surely a "program for all persons . . . receiving groundwater," as contemplated by the statute.

¶25    As did the majority below, AWC places primary reliance on the parallel provisions of A.R.S. §§ 45-564(A)(2) and -565(A)(2), which govern the first and second management plans. Section 45-564(A)(2) requires that the first plan contain a conservation program, which with respect to municipal uses "shall require reasonable reductions in per capita use and such other conservation measures as may be appropriate for individual users." Section 45-565(A)(2) provides that for municipal uses the second plan "shall require additional reasonable reductions in per capita use to those required in the first management period and use of such other conservation measures as may be

17

appropriate for individual users." AWC argues that these subsections mandate that the SMP include conservation measures imposed directly on individual users.

¶26 AWC's reading of these provisions is flawed. The final clause of each statute requires only that the plan include "such other conservation measures as may be appropriate for individual users." This clause does not require the imposition of conservation measures on end users. Instead, the statute tells the Director to impose only such measures "as may be appropriate," leaving open the possibility that he may conclude that no such measures, or only limited ones, are appropriate. Thus, any purported requirement for mandatory conservation requirements on all end users must necessarily come from the previous clause of each statute, which provides that the program developed by the Director for municipal uses "shall require reasonable reductions in per capita use," A.R.S. § 45-564(A)(2), or "additional reasonable reductions in per capita use to those required in the first management period," A.R.S. § 45-565(A)(2).

¶27 However, neither of these provisions states that the portion of the plan requiring "reasonable reductions in per capita use" must be imposed directly on end users. Rather, the statutes each provide that the "*program shall require*" such reductions. A.R.S. §§ 45-564(A)(2) (emphasis added), -565(A)(2) (same). The GPCD program in the Phoenix SMP meets that

18

statutory requirement. It requires reductions in per capita use, even if the requirement is achieved through direct regulation of AWC's spigot, rather than through individualized regulation of each user's faucet.

¶28    AWC also suggests that §§ 45-564(A)(2) and -565(A)(2) only pertain to regulation of end users, and that the requirement in each statute for plans requiring "reasonable reductions in per capita use" must therefore necessarily require imposition of such measures on end users. But this reading effectively rewrites the statutory scheme. For example, § 45-565(A)(2) provides that for municipal uses, "the program shall require additional reasonable reductions in per capita use . . . and use of such other conservation measures as may be appropriate for individual users." AWC reads the statute as if it instead provided that "the program shall require *for individual users* additional reductions in per capita use . . . and use of such other conservation measures as may be appropriate." But such a reading would mean that § 45-565(A)(2) provided no basis for imposing GPCD requirements on anyone but individual users. As we have noted above, A.R.S. § 45-565.01(H) effectively dooms any such argument, by stating that a municipal provider who applies for an NPCCP is not exempted from "per capita conservation requirements established under § 45-565, subsection A, paragraph 2" until the application is approved.

19

This statute necessarily assumes that § 45-565(A)(2) is not limited to authorizing the imposition of conservation requirements on individual users.

¶29    In short, the express language of the Code does not support the conclusion reached below that the SMP must include mandatory conservation requirements imposed directly on end users. Indeed, the majority of the court of appeals effectively conceded as much, suggesting instead that "common sense dictates that if one is assigned the duty of conserving a limited resource like groundwater, one needs the authority, and must assume the corresponding responsibility, to manage the resource throughout its entire cycle." *Ariz. Water Co.*, 205 Ariz. at 537 ¶ 18, 73 P.3d at 1272. The court of appeals therefore held that the statute required management of groundwater use by end users, because "legislative enactments [must] be given a sensible construction." *Id.* ¶ 19. While the legislature could have sensibly reached the conclusion that direct regulation of all end users was necessary, it also could have sensibly concluded that the goal of achieving per capita reductions in groundwater use could be most effectively served by leaving to the discretion of the expert Director of ADWR the decision about whether GPCD requirements should be imposed directly on a relatively small number of providers, rather than on hundreds of thousands of end users. "Common sense" could lead to either

20

conclusion, and thus provides no basis for concluding that the statute *must* have envisioned direct regulation of end users.

¶30    In circumstances like these, in which the legislature has not spoken definitively to the issue at hand, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). In such cases, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* ADWR has consistently interpreted the Code as allowing it to impose GPCD requirements directly on providers without also imposing conservation requirements directly on all end users, and that interpretation should be given great weight in the absence of clear statutory guidance to the contrary. *See Long v. Dick*, 87 Ariz. 25, 29, 347 P.2d 581, 584 (1959) (holding that although administrative interpretation of statutes is not binding on the court, the court will accept an administrative body's interpretation when there is "[a]cquiescence in meaning over long periods of time" so long as the interpretation is not "manifestly erroneous").

¶31    Indeed, ADWR is "precisely the type of agency to which deference should presumptively be afforded." *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37

21

(1981). The legislature mandated that the Director be an expert in the field. *See* A.R.S. § 45-102(D) (requiring that the Director "be experienced and competent in water resources management and conservation, and . . . have proven administrative ability"). In light of that expertise, the legislature gave the Director, known colloquially as the "water czar," Desmond D. Connall, Jr., *A History of the Arizona Groundwater Management Act*, 1982 Ariz. St. L.J. 313, 333, broad powers to achieve groundwater conservation. *See* A.R.S. § 45-103(B) (vesting in the Director "general control and supervision" of state groundwater). In cases like this, in which the statutory language is admittedly not dispositive,[11] the Director's expert interpretation deserves considerable deference by the judiciary, and should not be overturned simply because judges find a greater "sensibility quotient," *Ariz. Water Co.*, 205 Ariz. at 537 ¶ 19, 73 P.3d at 1272, in an alternative interpretation of the statute.

**¶32** In arguing against the Director's interpretation, AWC contends that the legislature could not have intended that municipal providers be required to comply with GPCD requirements without also providing them with tools to enforce cooperation by

---

[11] *See Ariz. Water Co.*, 205 Ariz. at 538 ¶ 26, 73 P.3d at 1273 ("[W]e must agree with the Department that the legislature did not expressly order inclusion of end-user conservation measures in the Department's management plans . . . .").

22

end users. But the legislature could have rationally concluded that the Director was in the best position to decide whether direct regulation of end users in any particular plan was necessary to achievement of per capita conservation goals. In certain circumstances, such direct regulation may be the most efficient method of achieving the desired reduction of groundwater use. In others, "imposing conservation requirements on all end users who receive groundwater may do little to reduce total groundwater use," and "[t]he resources devoted to creating and enforcing individual conservation requirements may be more effectively utilized in other ways." *Id.* at 548 ¶ 82, 73 P.3d at 1283 (concurring and dissenting opinion).

¶**33** As Judge Irvine noted, "whether it is sensible to regulate end users is simply not addressed by the record before us and is completely beyond our expertise." *Id.* at 547 ¶ 77, 73 P.3d at 1282. Our job is statutory construction, and for the reasons set forth above, we hold that the Code left the decision about whether to require direct regulation of groundwater users to the discretion of the expert "water czar."

¶**34** Our conclusion is buttressed by the fact that neither AWC nor the courts below could articulate precisely what sort of regulation of end users would suffice under their view of the statute. The trial judge, after rejecting the SMP for its failure to regulate end users directly, stated he did not think

23

that the Code required regulation of "each user or necessarily even for each category of user, but in some way we have to meet the statutory mandate of having something in a plan that addresses the problem with an end user."  *Id.* at 549 ¶ 84, 73 P.3d at 1284 (concurring and dissenting opinion) (quoting transcript of trial court proceedings).  But the SMP at issue here did impose conservation requirements directly on some end users, *see supra* n.7, and the superior court failed to indicate how much more direct regulation was needed in order to comply with the Code.  The majority below provided no greater guidance as to what the Code required, simply directing the Department to "return to the management plan drawing board" to "devise appropriate conservation measures for its management plan that include end users."  *Id*. at 538 ¶ 26, 73 P.3d at 1273.  Because even AWC concedes that "faucet-by-faucet" regulation of end users is not required by the Code, and because the SMP at issue does regulate some end users directly, it is not clear what "appropriate conservation measures" the court of appeals believes are mandated by the Code.[12]

---

[12]    As Judge Irvine observed:

> Arizona Water does not argue that the specific end user measures adopted by the Department are not "appropriate."  If it made such an argument courts would have a statutory basis upon which to review the actions of the Department.  The trial court's order here, however, merely tells the Department to again

24

¶35     In short, we conclude, as did the dissenting judge below, that while the Code requires the SMP to provide for reductions in per capita use of groundwater, the management plan need only impose such conservation measures that the Director concludes are "appropriate" directly on individual users. A.R.S. § 45-565(A)(2).    The Director thus had the facial statutory authority to promulgate an SMP that did not impose conservation measures directly on all of AWC's end users.[13]

_____

> exercise its discretion to develop a management plan, but to do it better.  Its inability to be more specific is strong evidence that the language of the statute simply does not support its ruling.

*Ariz. Water Co.*, 205 Ariz. at 549 ¶ 86, 73 P.3d at 1284 (concurring and dissenting opinion).

[13]     AWC also argues, as it did below, that imposing responsibility on municipal providers to limit GPCD places providers in an impossible regulatory conflict between ADWR and the Corporation Commission because a public service corporation cannot unilaterally refuse to serve or curtail service to customers in its service area. *See* A.R.S. § 40-321(B) (2001) (requiring public service corporations to render service "upon proper demand and tender of rates").  While arguing in the court of appeals that ADWR did not have the authority to tell AWC which customers it must serve or how much each customer could receive, the Commission took the position that there was no necessary conflict between its position and ADWR's GPCD requirements, noting that "there is nothing to prevent Arizona Water from asking the Commission to allow it to curtail service in appropriate circumstances."  *Ariz. Water Co.*, 205 Ariz. at 539 ¶ 28, 73 P.3d at 1274.  The court of appeals thus refused to address AWC's arguments on this point.  *Id.* at 538, 73 P.3d at 1273; *id.* at 544 ¶ 59, 73 P.3d at 1279 (concurring and dissenting opinion).  We agree.  This case presents "no inevitable conflict between the jurisdictions of the Department and the Commission" and there is no need to today "address a

¶36    For each municipal provider such as AWC, ADWR establishes a GPCD in the applicable management plan. In analyzing compliance with the GPCD program, ADWR analyzes the provider's water use under the "stacking" method. Under this method,

> the Department first counts against the provider's total GPCD requirement, all water used by a water provider during the year, except for spillwater and effluent that is not recovered effluent. Although water used by the provider during the year from such sources is counted when determining the provider's compliance with its total GPCD requirement, groundwater is counted last. If the provider is determined to be out of compliance with its total GPCD requirement, the provider is out of compliance only to the extent by which the amount of groundwater used exceeds the provider's total GPCD requirement.

*Ariz. Mun. Water Users Ass'n v. Ariz. Dep't of Water Res.*, 181 Ariz. 136, 139-40, 888 P.2d 1323, 1326-27 (App. 1994) ("*Water Users*") (footnote omitted). Under this method, a provider who uses no groundwater is always in compliance with its GPCD, no matter how much water it uses from other sources. A provider who uses only groundwater is limited to the amount specified by the GPCD. For providers using some combination of water sources including groundwater, ADWR will calculate the provider's total water use (excluding spillwater and non-recovered effluent), and

---

speculative conflict." *Id.* at 544 ¶ 59, 73 P.3d at 1279 (concurring and dissenting opinion).

in the event of any excess over the GPCD, will consider the provider out of compliance with the management plan *only* to the extent the excess is attributable to groundwater.

¶37      AWC uses a combination of CAP water and groundwater to serve its Apache Junction customers.  Because the total amount of water used from these two sources exceeds the applicable GPCD limitations, ADWR has determined that AWC is out of compliance with the SMP.  As such, AWC is subject to various enforcement actions and penalties.  *See* A.R.S. §§ 45-634 to -636.

¶38      AWC contends that ADWR's counting of CAP water in its "stacking" method is not authorized by the Code and is contrary to the Groundwater Act's general policy of limiting groundwater use.  *See* A.R.S. § 45-107(C) (2003) (providing that the Director does not have authority to limit rights of various individuals and entities to contract with the secretary of interior for delivery of CAP water).  The court of appeals unanimously rejected this argument.  *Ariz. Water Co.*, 205 Ariz. at 541-43 ¶¶ 47-52, 73 P.3d at 1276-78; *id.* at 543 ¶ 58, 73 P.3d at 1278 (concurring and dissenting opinion).

¶39      AWC's argument starts from the premise that the Code only authorizes ADWR to adopt conservation programs for "all non-irrigation uses of groundwater."  A.R.S. §§ 45-564(A)(2) (governing first management plan), -565(A)(2) (containing identical language with respect to second plan).  Because CAP

27

water is not groundwater as defined in A.R.S. § 45-101(5) (2003) ("water under the surface of the earth"), AWC contends that ADWR cannot count CAP water in determining whether a provider has complied with the GPCD, which is plainly a conservation program. *See* A.R.S. § 45-402(28)(a) (defining "[n]on-irrigation use" as "a use of groundwater other than an irrigation use").

¶40      The Code is not as clear on the subject as AWC claims. The same sections cited by AWC, after providing that the Director may establish conservation programs for "all non-irrigation uses of groundwater," go on to require "[f]or municipal uses" that management plans include "reasonable reductions in per capita use." A.R.S. §§ 45-564(A)(2), -565(A)(2). In turn, A.R.S. § 45-561(11) defines "[m]unicipal use" as

> all non-irrigation uses of water supplied by a city, town, private water company or irrigation district, except for uses of water, other than Colorado river water, released for beneficial use from storage, diversion or distribution facilities to avoid spilling that would otherwise occur due to uncontrolled surface water inflows that exceed facility capacity.

¶41      Several things are noteworthy about § 45-561(11). First, it occurs in the same article as §§ 45-564 and -565, and requires use of its definitions in that article "unless context otherwise requires." A.R.S. § 45-561. Second, § 45-561(11) defines "[m]unicipal use" as extending to "all non-irrigation uses of *water*." (Emphasis added.) If the legislature meant to

28

limit "municipal use" to "non-irrigation uses of groundwater,"
it could have done so without adding the phrase "of water,"
because A.R.S. § 45-402(28)(a) already defined "[n]on-irrigation
use" as "a use of *groundwater* other than an irrigation use."
(Emphasis added.) The use of the term "of water" thus suggests
a broader scope for "municipal use" other than just use of
groundwater. Moreover, the balance of § 45-561(11) plainly
includes use of Colorado River water within the definition of
"municipal use."[14]

¶42    Given § 45-561(11), AWC's argument must necessarily be
that "context otherwise requires" that the term "municipal uses"
in §§ 45-564(A)(2) and -565(A)(2) be interpreted as "municipal
uses of groundwater." Put differently, AWC must be arguing that
the first sentence of each subsection, which generally requires
ADWR to establish "conservation requirements for all non-
irrigation uses of groundwater," provides the necessary

---

[14]    In 1990, the predecessor of § 45-561(11) (then
numbered § 45-561(6)) was amended to add the phrase "except for
uses of water, other than Colorado river water, released from
storage facilities into a surface water distribution system to
avoid spilling." 1990 Ariz. Sess. Laws, ch. 71, § 3. As the
court in *Water Users* pointed out, "if the term 'water' used in
the original definition of 'municipal use' was limited to
groundwater, the legislature would have had no reason to amend
the definition of 'municipal use' to expressly exclude
spillwater, a form of surface water." 181 Ariz. at 142, 888
P.2d at 1329. *Water Users* therefore concluded that the
legislature meant, in defining municipal use, to include all
other sources of water not specifically excluded. *Id.* at 142-
43, 888 P.2d at 1329-30.

"context" for concluding that the requirement in the second sentence that ADWR adopt conservation programs for "municipal uses" was only to such "uses" of groundwater.

¶43    There are two problems with such an argument. First, if the legislature really meant to limit the term "municipal uses" in §§ 45-564(A)(2) and -565(A)(2) to such uses of groundwater, it could have said so expressly. *See Water Users*, 181 Ariz. at 142, 888 P.2d at 1329 (noting that throughout the Code the legislature used the term "water" when it meant to "refer to water from all sources," versus its use of "groundwater" or "surface water" when it intended to "distinguish between different sources of water"). Second, this argument requires that we interpret the third sentence of each subsection, which mandates conservation requirements for "industrial uses," to be limited to industrial uses of "groundwater." But such an interpretation flies in the face of the definition of "[i]ndustrial use" in § 45-561(5) as "a non-irrigation use of *water* not supplied by a city, town or private water company." (Emphasis added.)

¶44    In addressing a similar issue, the court of appeals concluded in *Water Users* that the term "municipal uses" in § 45-565(A)(2) should be interpreted, consistent with its definition in § 45-561(11), as including all sources of water, including recovered effluent. 181 Ariz. at 142-43, 888 P.2d at 1329-30.

30

*Water Users* therefore concluded that recovered effluent could be counted under the "stacking" method in determining a municipal provider's compliance with its GPCD requirements. We reach the same conclusion as to CAP water.

¶45 Moreover, even if we were to accept AWC's contention that CAP water is not included in the phrase "municipal uses" in § 45-565(A)(2), we would still reach the same result. The "stacking" method does not restrict a municipal provider's use of CAP water; any provider may use as much CAP water as it wishes. Rather, ADWR simply takes use of CAP water and other surface water into account when determining the GPCD compliance of those providers who also use groundwater. Because the groundwater is counted last, the Department restricts only the use of that groundwater through the "stacking" method. *See Water Users*, 181 Ariz. at 141, 888 P.2d at 1328 (concluding that even if ADWR had no authority to regulate effluent, counting recovered effluent under the "stacking" method "regulates only groundwater usage," because non-compliance is measured not by how much effluent was used, but "only to the extent which groundwater use exceeds a provider's total GPCD requirement").

## III.

¶46 For the reasons above, we conclude (a) that ADWR has the statutory authority to impose GPCD requirements on municipal providers; (b) that the Code does not mandate that ADWR impose

31

conservation requirements on all end users before imposing GPCD requirements on municipal providers; and (c) that ADWR may, under its "stacking" method, consider use of CAP water in determining GPCD compliance.

¶47    These holdings do not dispose entirely of AWC's claims.  Section 45-565(A)(2) authorizes only requirements for "*reasonable* reductions in per capita use." (Emphasis added.) AWC argued during the administrative proceedings below that the GPCD for its Apache Junction water utility was not reasonable, in light of various particular circumstances of that utility. The agency rejected this argument.  The superior court did not reach this claim, however, finding the SMP facially invalid for failure to impose direct regulation on all end users.  Because it affirmed the judgment of the superior court, the court of appeals also did not reach the issue.  Given that the courts below did not address AWC's argument that the GPCD was unreasonable as applied to the Apache Junction utility, we decline in the first instance to address that fact-intensive issue, but instead remand this case to the superior court for such other proceedings as may be necessary.

32

¶**48** The opinion of the court of appeals is affirmed in part and vacated in part, and the judgment of the superior court is vacated. This case is remanded to the superior court for further proceedings consistent with this opinion.

_____
Andrew D. Hurwitz, Justice

CONCURRING:


_____
Charles E. Jones, Chief Justice


_____
Ruth V. McGregor, Vice Chief Justice


_____
Rebecca White Berch, Justice


_____
Michael D. Ryan, Justice